UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2014
```

ERIC RUBENSTEIN, AARON SEGAL,
SCOTT CARDONE, and DAVID
LANDSKOWSKY,

                    Plaintiffs/Petitioners,

        - against -

ADVANCED EQUITIES, INC., BYRON
CROWE, DWIGHT BADGER, and KEITH
DAUBENSPECK,

                    Defendants/Respondents.

**MEMORANDUM
OPINION & ORDER**

13 Civ. 1502 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            Petitioners Eric Rubenstein, Aaron Segal, Scott Cardone, and David

Landskowsky are former employees of Respondent Advanced Equities, Inc. ("AEI"), a broker-

dealer subject to the Financial Industry Regulatory Authority ("FINRA").   Respondents Byron

Crowe, Dwight Badger, and Keith Daubenspeck are former officers and directors of Advanced

Equities Financial Corporation ("AEFC"), the parent company of AEI.  This parties' dispute

arises from Petitioners' contracts with AEI. (Roth Aff. (Dkt. No. 1), Ex. 3)  The dispute was

submitted to a FINRA arbitration panel, which found in Respondents' favor.  (Id., Ex. 2)

Petitioners have moved for an order vacating the final arbitration award. (Petition (Dkt. No. 1))

Respondents have cross-moved for an order confirming the award. (Dkt. No. 8)  For the reasons

stated below, Petitioners' motion to vacate the arbitration award will be denied, and

Respondents' motion to confirm the award will be granted.

# BACKGROUND

## I.   THE CONTRACT DISPUTE

Headquartered in Chicago, AEI was a registered broker-dealer specializing in late-stage private equity financing.  (Pet. Br. (Dkt. No. 1) at 4; Resp. Br. (Dkt. No. 10) at 4)  In 2006, AEI opened a New York office and began recruiting brokers to join that office, including Tim Herrmann and Todd Harrigan.[1]  (Pet. Br. (Dkt. No. 1) at 4; Resp. Br. (Dkt. No. 10) at 5)  During the recruitment process, AEI flew Herrmann and Harrigan to Chicago to meet with AEI's President – Jeff Fisher – and Respondents Daubenspeck and Badger on several occasions.  (Pet. Br. (Dkt. No. 1) at 4-5)  On November 16, 2006, Herrmann and Harrigan entered into employment agreements with AEI.  (Id.; Resp. Br. (Dkt. No. 10) at 5)

Herrmann and Harrigan recruited Petitioners Rubenstein, Landskowsky, and Cardone to join AEI's New York office.  (Pet. Br. (Dkt. No. 1) at 6, 10; Resp. Br. (Dkt. No. 10) at 5)  In January 2007, Rubenstein, Landskowsky, and Cardone began talking with Fisher about the possibility of joining AEI.  (Pet. Br. (Dkt. No. 1) at 10)  Rubenstein also met with Respondents Daubenspeck, Badger, and Crowe in Chicago to discuss AEI's proposed terms of employment.  (Id.)  On March 30, 2007, Rubenstein, Landskowsky, and Cardone entered into employment agreements with AEI and joined its New York office.  (See Roth Aff. (Dkt. No. 1), Exs. 5, 6, 9)

In November 2006, Fisher recruited Petitioner Segal at a series of meetings, some of which took place at AEI's New York office.  (Pet. Br. (Dkt. No. 1) at 7)  On January 8, 2007, Segal entered into an employment agreement with AEI and joined its New York office.  (See Roth Aff. (Dkt. No. 1), Ex. 8)

---

[1] Herrmann and Harrigan were claimants in the FINRA arbitration proceeding, but have not joined as petitioners in the matter before this Court.  (See Roth Aff. (Dkt. No. 1), Ex. 3)

Petitioners claim that, under their contracts with AEI, they are entitled to fifty-percent of the "gross commissions" that they earned.  (Pet. Br. (Dkt. No. 1) at 3)  Petitioners further assert that they were led to believe – during their recruitment meetings with Respondents – that "gross commissions" meant the total revenue that they brought into AEI.  (Id. at 17)  Petitioners also contend that language in their employment agreements is consistent with this understanding.  (Id.)  The term "gross commissions" is not defined in Petitioners' employment agreements, however.  (See Roth Aff. (Dkt. No. 1), Exs. 5, 6, 8, 9)

The employment agreements of Petitioners Rubenstein, Landskowsky, and Cardone include the following language as to commissions:

> Commission Payout:  Your Commission Payout will be the greater of the then-current minimum monthly payment for exempt employees in New York, currently $2,324 (the "'Monthly Draw") or (ii) a Commission Payout equal to the standard AEI commission payout, which is currently 50%.

> Private Equity Commissions:  Currently gross commissions on private equity transactions are three percent (3%) on "direct" investors (generally those investing $1,000,000 or more), and eight percent (8%) on "indirect" investors (generally those investing less than $1,000,000) (these gross commission rates, are subject to change on future private equity transactions in AEI's sole discretion.)  Thus, by way of example, Employee would receive fifty percent (50%) of three percent (3%) or fifty percent (50%) of eight percent (8%) of the amount invested, as applicable.

(Id., Exs. 5, 6, 9)

Petitioner Segal's employment agreement contains an identical provision regarding "Private Equity Commissions," and the following language regarding commission payouts:

> Commission Payout:  Your Commission Payout will be the greater of the then-current minimum monthly salary for exempt employees in New York, currently $2,324 (the "'Monthly Draw") or the Monthly Commission Payout Schedule described below:

> • 90% from (i) the date on which your securities licenses are transferred to

AEI through (ii) the subsequent full calendar month,
- 90% in calendar month two,
- 80% in calendar month three,
- 70% in calendar month four,
- 70% in calendar month five and
- 60% in calendar month six.

After the first six (6) full calendar months of employment after your licensing, your Commission Payout shall be the then-current AEI standard commission payout, which is currently 50%.

(Id., Ex. 8)

Petitioners also claim that their employment agreements entitle them to bonuses at specified percentages if their commissions reach certain levels, and to warrant compensation and back-end interest in companies for which they raised money.   (Pet. Br. (Dkt. No. 1) at 14-16)

Under their employment agreements, each Petitioner agreed to execute a promissory note, pursuant to which AEI would make a loan to Petitioners that would be forgiven over the first five years of their employment at AEI.  (See Roth Aff. (Dkt. No. 1), Exs. 5, 6, 8, 9) Rubenstein, Landskowsky, and Cardone's agreements provide that

[i]n the event that (i) Advanced Equities terminates [Petitioner's] employment or registration with Advanced Equities for Cause, as defined below or (ii) [Petitioner] voluntarily terminates his employment or registration with Advanced Equities, in either case, at any time prior to full and final satisfaction of [the] Note, the then outstanding balance (both principal and interest) under [the] Note shall immediately become due and payable without notice, protest, presentment or demand and no further forgiveness shall occur.

(Id., Exs. 5, 6, 9)

Segal's agreement likewise includes a loan that would be forgiven over a five-year period.  (See id., Ex. 8)  Segal's promissory note states that

[n]otwithstanding anything contained herein to the contrary, in the event that [Petitioner's] employment or registration with Advanced Equities is terminated for any reason whatsoever or no reason at all, by [Petitioner] or by Advanced Equities, in any case at any time prior to the full and final satisfaction of this Note . . . the then outstanding balance (both principal and interest) under this Note

4

shall immediately become due and payable without notice, protest, presentment,
or demand and no further forgiveness shall occur.

(Elisofon Decl. (Dkt. No. 9), Ex. 38)  Each employment agreement states that the

accompanying promissory note's "terms [are] incorporated" in the contract.  (Roth Aff.

(Dkt. No. 1), Exs. 5, 6, 8, 9)  The promissory notes provide that Petitioners will be liable

for "any and all of the holder's costs in connection with the enforcement and collection

[of unpaid amounts due], including without limitation any and all attorneys' fees."

(Elisofon Decl. (Dkt. No. 9), Exs. 38-40)

     Petitioners claim that Respondents did not pay them the full amount of their

promised commissions, or the bonus and warrant compensation that they were entitled to

receive, under their employment agreements.  (Pet. Br. (Dkt. No. 1) at 3-4, 15-17)  When

Petitioners complained to Respondents, their complaints were allegedly "met with hostility and

threats."  (Id. at 18-19)

     Petitioners claim that after brokers' complaints about warrant compensation at

AEI grew, AEI brokers from various AEI offices – including Rubenstein and New York Branch

Manager Frank Mazzola – attempted to form a committee to address the treatment and

distribution of warrants.  (Id. at 21; Elisofon Decl. (Dkt. No. 9), Ex. 1 at 295-97)  However,

Respondents allegedly refused to recognize the committee.  (Pet. Br. (Dkt. No. 1) at 21)

According to Respondents, the only warrants that Petitioners were entitled to were worthless, so

they were owed no compensation.  (Resp. Br. (Dkt. No. 10) at 12)  Petitioners claim, however,

that this explanation is misleading; they assert that AEI's promise to provide them with a

percentage of warrants "earned by AEI" was a "sham" because – as they later learned – AEFC

and not AEI had possession of the warrants, and that is why AEI could claim that it had no

warrant-related compensation to share with Petitioners.  (Pet. Br. (Dkt. No. 1) at 22)

According to Petitioners, similar claims have been made nationwide against Respondents by their former employees, including those who worked in AEI's San Francisco and Chicago offices.  (Id. at 20)

Petitioners further allege, that beginning in the summer of 2007, Respondents urged Petitioners and other AEI brokers to invest their money and their client's money in what was then an unnamed energy company that Respondents claimed was developing a revolutionary new fuel cell technology.  (Id. at 23-24)  Respondents allegedly pitched this deal to Petitioners' clients and represented that the energy company already had $2 billion worth of sales orders from various major companies waiting to be filled.  (Id. at 24)  According to Petitioners, however, these representations were false, and led to an SEC investigation of AEI that resulted in a $1,000,000 fine on AEI, a $100,000 fine and a one-year bar from the securities industry for Badger, and a $50,000 fine against Daubenspeck.  (Id. at 25; see Roth Aff. (Dkt. No. 1), Ex. 1)

Petitioners claim that AEI violated their employment agreements throughout their employment.  On October 31, 2009, AEI fired Segal.  (Elisofon Decl. (Dkt. No. 1), Ex. 1 at 2170)  On December 11, 2009, Rubenstein, Landskowsky, and Cardone resigned.  (Id., Ex. 2)  According to Respondents, Rubenstein, Landskowsky, and Cardone left to join Segal in opening a competing firm.  (Resp. Br. (Dkt. No. 10) at 5)

## II.    THE ARBITRATION

On February 19, 2010, Petitioners – along with Herrmann and Harrigan – initiated a FINRA arbitration proceeding against the Respondents and AEFC, asserting claims for breach of contract, breach of FINRA rules, unjust enrichment, breach of the covenant of good

faith and fair dealing, fraud, constructive discharge, constructive trust, conversion, violations of the New York Civil Rights Law, and unfair competition.[2]   (Roth Aff. (Dkt. No. 1), Ex. 3)

   Respondent AEI counterclaimed for breach of contract, breach of fiduciary duty, unfair competition, misappropriation of trade secrets, and breach of contract.  (Roth Aff. (Dkt. No. 1), Ex. 2)

   The arbitration proceedings took place in New York.  Three arbitrators (the "Panel") conducted twelve pre-hearing sessions and sixty hearing sessions that took place over thirty-two days.  (Id., Ex. 2)  The Panel heard testimony from twenty-two fact witnesses and three expert witnesses.  (Id., Ex. 2 ¶ 3)

   A critical issue at the arbitration was the meaning of the term "gross commissions" in Petitioners' employment agreements.  (See Pet. Br. (Dkt. No. 1) at 29; Resp. Br. (Dkt. No. 10) at 5-8)  Petitioners argued that "gross commissions" meant "the total cash compensation received by AEI for Claimants' clients' transactions (i.e., placement fees)."  (Roth Aff. (Dkt. No. 1), Ex. 4 at 2)  Respondents contended, however, that "gross commissions" had a meaning different from "placement fees" – a term that is used in other sections of Petitioners' employment agreements.  (Id. at 3; Resp. Br. (Dkt. No. 10) at 7-8)  According to Respondents, AEI received a "placement fee" from the issuer of a security, as well as a mark-up fee from its

---

[2]  Petitioners' employment agreements with AEI provide that any dispute between them and AEI that "cannot be settled by the parties within a reasonable time will be arbitrated before the offices of the NASD Dispute Resolution in accordance with Employee's Form U-4 and NASD rules.  Venue for the proceeding will be determined pursuant to the NASD Code of Arbitration Procedure and the rules and procedures of NASD Dispute Resolution."  (See Roth Aff. (Dkt. No. 1), Exs. 5, 6, 8, 9)  "NASD changed its corporate name to FINRA on July 30, 2007."  Fiero v. Fin. Indus. Regulatory Auth., Inc., 606 F. Supp. 2d 500, 504 (S.D.N.Y. 2009), rev'd on other grounds, 660 F.3d 569 (2d Cir. 2011).  The parties entered into submission agreements – agreeing to arbitrate according to FINRA rules – after Petitioners submitted their statements of claim.  (See Elisofon Decl. (Dkt. No. 9), Ex. 4; Roth Aff. (Dkt. No. 1), Ex. 2)

indirect investors. (Resp. Br. (Dkt. No. 10) at 7; see Roth Aff. (Dkt. No. 1), Ex. 4 at 2-3)

Portions of the placement fee and mark-up fee for a given transaction would be assigned to a

"grid" for a particular broker as a "gross commission," and the remainder of the placement and

mark-up fees would be used "to pay non-commissioned employees and overhead costs." (Resp.

Br. (Dkt. No. 10) at 7; see Roth Aff. (Dkt. No. 1), Ex. 4 at 4-6)

   After Petitioners presented their case-in-chief, Respondents and AEFC moved to

dismiss all claims, and on April 19, 2012, the Panel granted the motion as to most of Petitioners'

claims. (Roth Aff. (Dkt. No. 1), Ex. 37) All claims against the individual Respondents were

dismissed. (Id.) The Petitioners' only surviving claims were Petitioners' breach of contract

claims related to compensation for AEFC stock options, and commissions and bonus

compensation allegedly owed by AEI. (Id.)

   On December 6, 2012, after the close of all the evidence, the Panel denied

Cardone, Landskowsky, Rubenstein, Harrigan, and Herrmann's claims in their entirety. (Roth

Aff. (Dkt. No. 1), Ex. 2 at 3) The Panel awarded Segal $18,000 in compensatory damages "for

the portion of his bonus #1 claim that is unrelated to his higher commissions claim and which

was withheld by AEI because of the unpaid balance on his promissory note," and denied the

remainder of his claims. (Id.) The Panel awarded AEI compensatory damages against each of

the Petitioners reflecting unpaid balances on the promissory notes, together with pre-judgment

interest and attorneys' fees "pursuant to the terms" of the promissory notes. (Id. at 3-4)

   The Panel denied all of AEI's claims against Harrigan and Hermann for

outstanding balances on their promissory notes, however. (Id. at 4) The Panel found that

> AEI had withheld funds from the Harrigan, Herrmann, and Segal loans for related
> tax payments at the time of the loans. Unlike the Segal employment contract
> which specifically states that Segal is liable for the entire loan balance outstanding
> regardless of funds withheld for tax payments, the Harrigan and Herrmann

employment contracts are silent on the issue.  Given that AEI had withheld funds
at its sole discretion and it is highly unlikely that Harrigan and Herrmann can
recover those funds, the Panel deems it fair to deduct funds withheld from the
outstanding Harrigan and Herrmann loan balances, leaving no net balance due on
their promissory notes.  The Panel also deems it fair to enforce the clear terms of
Segal['s] employment contract.  No funds were withheld for taxes from the
Rubenstein, Landskowsky, or Cardone loans and accordingly it is not an issue on
the net amount due on their promissory notes.  All other AEI claims against
Harrigan and Herrmann are denied.

(Id.)  The Panel denied all other requested relief.  (Id.)  Other than as just described, the Panel

did not explain the bases for its award.  (See id.)

On February 4, 2013, Petitioners moved to vacate the arbitration award in New

York state court.  (Request for Judicial Intervention (Dkt. No. 1))  Petitioners assert that the

Panel (1) wrongfully excluded pertinent evidence during the proceedings; and (2) acted with

manifest disregard for the law.  (Pltf. Br. (Dkt. No. 1) at 29-48)

On March 6, 2013, Defendants filed a notice of removal, bringing the action

before this Court.  (Notice of Removal (Dkt. No. 1))  On May 3, 2013, Defendants cross-moved

for confirmation of the arbitration award, and an award of post-award interest and attorneys' fees

and costs.  (Dkt. No. 8)

## DISCUSSION

I.       **LEGAL STANDARD FOR VACATUR AND CONFIRMATION**

"Following issuance of an arbitration award, § 9 of the Federal Arbitration Act

('FAA') provides that a party may apply to a district court 'for an order confirming the award,

and thereupon the court must grant such an order unless the award is vacated, modified, or

corrected as prescribed in sections 10 and 11 of this title.'"  STMicroelectronics, N.V. v. Credit

Suisse Sec. (USA) LLC, 648 F.3d 68, 74 (2d Cir. 2011) (quoting 9 U.S.C. § 9).  Normally,

"confirmation of an arbitration award is a summary proceeding that merely makes what is

already a final arbitration award a judgment of the court." <u>Florasynth, Inc. v. Pickholz</u>, 750 F.2d 171, 176 (2d Cir. 1984). This is because "[t]he 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" <u>AT&T Mobility LLC v. Concepcion</u>, 131 S. Ct. 1740, 1748 (2011) (quoting <u>Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 478 (1989)) (second alteration in original). "The arbitrator's rationale for an award need not be explained, and the award should be confirmed '"if a ground for the arbitrator's decision can be inferred from the facts of the case."'" <u>D.H. Blair & Co., Inc. v. Gottdiener</u>, 462 F.3d 95, 110 (2d Cir. 2006) (quoting <u>Barbier v. Shearson Lehman Hutton, Inc.</u>, 948 F.2d 117, 121 (2d Cir. 1991) (quoting <u>Sobel v. Hertz, Warner & Co.</u>, 469 F.2d 1211, 1216 (2d Cir. 1972))). "Only 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." <u>Id.</u> (quoting <u>Landy Michaels Realty Corp. v. Local 32B-32J, Serv. Emps. Int'l Union</u>, 954 F.2d 794, 797 (2d Cir. 1992)).

"A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." <u>Id.</u> Under Section 10 of the Federal Arbitration Act, vacatur may be granted

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). "In addition to the section 10(a) grounds for vacatur, [the Second Circuit] ha[s] recognized a judicially-created [gloss on the specific] ground[s] [for vacatur], namely that 'an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law.'" Jock v. Sterling Jewelers Inc., 646 F.3d 113, 121 (2d Cir. 2011) (quoting Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 208 (2d Cir. 2002)); see Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 94 (2d Cir. 2008), rev'd on other grounds and remanded, Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662 (2010) ("'[M]anifest disregard,' reconceptualized as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA, remains a valid ground for vacating arbitration awards.").

## II.   THE PANEL'S REFUSAL TO HEAR CERTAIN EVIDENCE

Petitioners argue that vacatur is necessary because of the Panel's refusal to admit the following "highly pertinent evidence":  (1) records from AEI offices outside New York and testimony from former AEI employees who worked outside New York; and (2) evidence relating to custody and control of the warrants referenced in Petitioners' employment agreements.  (Pet. Br. (Dkt. No. 1) at 29-35)

### A.   Standard for Vacatur Based on Refusal to Hear Pertinent Evidence

"Section 10(a)(3) of the Arbitration Act provides that the court may issue an order vacating an arbitration award '[w]here the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy.'"  GFI Sec. LLC v. Labandeira, No. 01 Civ. 00793 (JFK), 2002 WL 460059, at *6 (S.D.N.Y. Mar. 26, 2002) (quoting 9 U.S.C. § 10(a)(3)) (alterations in original).  "This provision has been narrowly construed so as 'not to impinge on the broad discretion afforded arbitrators to decide what evidence should be

presented.'" Id. (quoting Ripa v. Cathy Parker Mgmt., Inc., No. 98 Civ. 0577 (SAS), 1998 WL 241621, at *3 (S.D.N.Y. May 13, 1998)).

"If the arbitrator's refusal to hear pertinent and material evidence prejudices one of the parties, the court may set aside the award." Id. "A fundamentally fair hearing requires that the parties be permitted to present evidence and cross-examine adverse witnesses." Id. at *7. "However, an arbitrator's refusal to hear evidence does not automatically require the vacatur of an award." Id. "The misconduct of the arbitrator must amount to a denial of fundamental fairness . . ." Id. at *6. Accordingly, "'[o]nly the most egregious error which resulted in adversely affecting the rights of a party would justify . . . and require vacatur of an award.'" Id. (quoting Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc., 794 F. Supp. 1265, 1277 (S.D.N.Y. 1992) (quoting Hunt v. Mobil Oil Corp., 654 F. Supp. 1487, 1512 (S.D.N.Y. 1987))) (second alteration in original).

Moreover, "[s]ection 10(a)(3) allows only limited review of arbitrators' evidentiary rulings." Brandt v. Brown & Co. Sec. Corp., No. 94 Civ. 6640 (JSM), 1995 WL 334381, at *4 (S.D.N.Y. June 5, 1995), aff'd, 100 F.3d 942 (2d Cir. 1996). "'It is well settled that the arbitrator is the judge of admissibility and relevancy of evidence submitted in an arbitration proceeding.'" Id. (quoting Pompano-Windy City Partners, 794 F. Supp. at 1277). In evaluating an arbitrator's refusal to hear certain evidence, courts also take into account the fact that "[a]rbitration proceedings are not constrained by formal rules of evidence or procedure." GFI Sec. LLC, 2002 WL 460059, at *7. "'[I]n handling evidence an arbitrator need not follow all the niceties observed by the federal courts.'" Id. (quoting Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, Int'l Union, United Auto, Aerospace, & Agric. Implement Workers of Am. (UAW), 500 F.2d 921, 923 (2d Cir. 1974)). "Arbitrators must have enough evidence to

make an informed decision, but 'they need not compromise the speed and efficiency that are the goals of arbitration by allowing the parties to present <u>every piece</u> of relevant evidence.'" <u>Id.</u> (quoting <u>Areca, Inc. v. Oppenheimer & Co., Inc.</u>, 960 F. Supp. 52, 55 (S.D.N.Y. 1997) (internal quotation omitted)) (emphasis in original).  Finally, "[a]n award cannot be set aside because of an arbitrator's refusal to hear cumulative or irrelevant evidence." <u>Id.</u> at *6.

**B.    <u>The Panel's Exclusion of the Non-New York Evidence</u>**

Petitioners complain that the Panel did not permit them to call brokers who worked at AEI offices outside New York, or to introduce evidence of arbitration awards obtained by such brokers against AEI.  (Pet. Br. (Dkt. No. 1) at 5, 20)  Petitioners point to three instances. First, the Panel denied Petitioners' motion to issue subpoenas to eight individuals who were formerly employed at AEI offices outside New York.  (<u>Id.</u> at 33; Roth Aff. (Dkt. No. 1), Ex. 27) Second, the Panel excluded the testimony of John S. Galinsky – a broker at AEI's Chicago office and allegedly a close friend of Daubenspeck – who had agreed to appear voluntarily at the hearings on Petitioners' behalf.  (Pet. Br. (Dkt. No. 1) at 33)  At that time, Galinsky was pursuing his own arbitration claim against AEI.  (<u>See</u> Roth Aff. (Dkt. No. 1), Ex. 29)  Third, the Panel precluded Petitioners from introducing records and testimony about other arbitration awards against AEI.  (Pet. Br. (Dkt. No. 1) at 29-32)

Petitioners argue that this evidence was relevant to show that Respondents had made the same false representations to brokers outside New York that Petitioners claimed had been made to them.  (<u>Id.</u> at 20)  Petitioners further claim that this evidence would have demonstrated that the "fraudulent conduct perpetrated on Petitioners was a company-wide policy and practice" that merited a punitive damages award.  (<u>Id.</u> at 25)

Petitioners have not demonstrated that the Panel's rulings on these issues justify vacatur. The Panel reasonably concluded that evidence involving the claims of brokers outside the New York office – individuals who were not involved in recruiting Petitioners, who played no role in negotiating their employment agreements, and who were not privy to information about the compensation Petitioners had received – was not pertinent in determining AEI's liability to Petitioners. This reasoning was expressed by two of the arbitrators:

> Arbitrator Melbardis: The problem is, [the Petitioners] had contracts, and whether those contracts were breached is not going to be proved by other cases. The panel is fully aware that there were other cases and that's essentially where it should remain because one case does not prove your case.
> . . . .
> Arbitrator Chin: I don't know if this issue [of other litigation by brokers against AEI] has any bearing on the case at hand. We have the testimony of the six Claimants. We have the testimony of Mr. Crowe, and that's what's going to be the basis of our determination. Other cases don't matter.

(Elisofon Decl. (Dkt. No. 9), Ex. 1 at 3890, 3908) As to arbitration awards that had been issued in other cases, the Panel observed that the "[t]he general rule is that [a] FINRA arbitration award[ ] is not to be considered precedent to other cases." (Id. at 3883) Accordingly, awards issued by other arbitrators as to other AEI brokers working outside New York simply were not relevant. (See id. at 3883)

This reasoning applies with equal force to Galinsky's proffered testimony. Galinsky was the former Senior Managing Director of AEI's Chicago office. (Roth Aff. (Dkt. No. 1), Ex. 27 at 3) While Petitioners allege that Galinsky had "a uniquely close relationship with Daubenspeck," and would have testified to "Respondents' fraudulent conduct both in the recruitment process and failure to pay earned commissions and warrants," Petitioners have not shown that Galinsky has knowledge of (1) what Petitioners were told during the recruitment process; (2) Petitioners' employment agreements and agreed-upon compensation; or (3) the

14

compensation Petitioners received.   (Pet. Br. (Dkt. No. 1) at 33-34)  Moreover, the fact that

Galinsky was a member of the brokers' "warrant committee" does not suggest that his testimony

would have been probative.  (See id. at 34)  The "warrant committee" did not speak for AEI.  It

was, instead, "a little mutiny on the ship . . . where some of the top brokers at the firm . . . talked

about . . . doing something to try to convince management to live up to their obligations

[regarding warrants]."  (Elisofon Decl. (Dkt. No. 9), Ex. 1 at 295-96)  In any event, Petitioner

Rubenstein was a member of the "warrant committee" and he testified about its activities at the

arbitration.  (Id.)

> As to Petitioners' argument that information concerning non-New York brokers
would have been probative of Respondents' alleged common fraudulent scheme or plan,
Petitioners had an ample opportunity at the arbitration to introduce evidence concerning their
common scheme or plan argument.  Indeed, the six claimants at the arbitration – the four
Petitioners and their two former colleagues – all argued that common misrepresentations had
been made to them.  The Panel was likewise aware that former AEI brokers outside New York
had alleged that Respondents had misled them.  (See id. at 3913 ("We're aware that there were
other claims. . . . Let's focus upon this case."))  Indeed, the Panel heard testimony indicating that
AEI had made misled and mistreated brokers in other AEI offices.  (See, e.g., id. at 295-97
(Rubenstein discussing how brokers from different offices formed the "warrant committee" to
complain about warrant compensation), 1291-94 (Landskowsky suggesting that two brokers in
AEI's San Francisco office were unjustly fired), 4653-54 (cross examination of Badger regarding
arbitration award to broker from AEI's San Francisco office))

> In sum, Petitioners have not shown that they were unfairly prejudiced by the
Panel's refusal to hear additional evidence concerning their "common scheme or plan" argument.

At bottom, what Respondents may have said to brokers at AEI offices outside New York is not probative of what Respondents said or otherwise communicated to Petitioners.  Petitioners have not demonstrated that the Panel's rulings on these issues amount to an "egregious error" or a "denial of fundamental fairness" justifying vacatur.[3]  See GFI Sec. LLC, 2002 WL 460059, at *6-7.

C.     **The Panel's Refusal to Issue a Subpoena to Fifth Third Bank**

During the arbitration proceeding, Petitioners alleged that – based upon the complaint in the Galinsky arbitration – they had a good faith basis to believe that

> [o]nce AEFC received warrants earned by Galinsky and AEI's other brokers, AEFC then pledge[d] those warrants as collateral to secure a multi-million dollar line of credit [from Fifth Third Bank].  That line of credit was then used to assist AEFC in funding its business as well as to issue personal loans and bonuses to Respondents Badger and Daub[]enspeck.  In other words, Respondents Badger and Daubenspeck used this line of credit to supplement their own incomes.  Based on information and belief, Respondent Badger has taken as least one interest-free loan in the amount of approximately $3 million from AEFC.

(Roth Aff. (Dkt. No. 1), Ex. 28 at 2 (internal quotation omitted))  Petitioners went on to argue that AEFC was using the warrants that had been promised to them as collateral to obtain a line of credit from Fifth Third Bank, and asked the Panel to issue a subpoena for Fifth Third Bank records reflect such transactions.  (Id. at 1-3)

Petitioners' proposed subpoena sought

---

[3]  Petitioners contend that the Panel erred in preventing them from cross-examining Crowe – the chief operating officer of AEI – about whether the "gross commission" term in their employment agreements had been the subject of dispute with other brokers before Petitioners were hired by AEI.  (Pet. Br. (Dkt. No. 1) at 30-32)  According to Petitioners, Crowe testified on direct that "a dispute involving [the gross commission term] never arose prior to Petitioners' hiring."  (Id. at 30)  Petitioners provide no record cite for that alleged testimony, however, and none of the transcript pages provided to the Court reflect such testimony.  Given that there is no evidence that Crowe gave such testimony, the Panel cannot be faulted for refusing to admit evidence that would have undermined it.

1.  Any and all documents, in the bank's custody or subject to its control, that in any way relate to [Advanced Equities, Inc.; Keith Daubenspeck; Dwight Badger; and Advanced Equities Financial Corp., as a parent company of Advanced Equities, Inc.] that relate to any accounts (e.g., loan accounts) in which Advanced Equities Financial Corp., Advanced Equities, Inc., Keith Daubenspeck, and/or Dwight Badger may have, whether under a trade or corporate name, or in association with others, as of this subpoena or within three (3) years prior thereto.

2.  As to each account, provide any and all documents available as to the contents (if known) of each that relate to warrants owned or controlled at any time by any of the individuals or entities.

3.  Please produce any documents as it relates to any encumbrances on the warrants identified in request No. 2, including, but not limited to, all loans and lines of credit.

(Id., Ex. 28 at Ex. A)

Respondents objected to the proposed subpoena arguing, inter alia, that the records were irrelevant because "no warrants were pledged to Fifth Third Bank."  (See Elisofon Decl. (Dkt. No. 9), Exs. 25, 27)

On June 29, 2011, the Panel denied without prejudice Petitioners' request for a subpoena.  (Id., Ex. 28) The Panel invited Petitioners to "submit a new subpoena that is limited in time and scope to information on the specific warrants that are actually in issue, believed to be no more than for about nine (9) of the companies listed in footnote 1 of letter of 03/18/11, and limited to information as to whether said warrants were used as collateral for interest free loans to any respondent."  (Id.)

On July 14, 2011, Petitioners provided a revised subpoena for the Bank requesting

1.  Any and all documents, in the bank's custody or subject to its control, that relate to [Advanced Equities, Inc.; Keith Daubenspeck; Dwight Badger; and Advanced Equities Financial Corp., as a parent company of Advanced Equities, Inc.] that relate to any loans in which Advanced Equities Financial Corp., Advanced Equities, Inc., Keith Daubenspeck, and/or Dwight Badger may have, beginning in October 2006 through the date of this subpoena that relate to or contain the following terms:

    a. Force 10 and/or Turin
    b. Altra
    c. Amyris
    d. Motricity
    e. SpectraScience
    f. Foveon
    g. iSkoot
    h. NetXen
    i. RMI
    j. Fabrik

2. Please produce any documents as it relates to any encumbrances on the warrants identified in request No. 1, including, but not limited to, all loans and lines of credit.

(Id., Ex. 29 at Ex. C)

After Petitioners submitted their revised subpoena request, Respondents presented the Panel with a July 22, 2011 letter from the Bank stating that "the Bank has no collateral which secures the obligations of [Advanced Equities Financial Corp.] under the Credit Agreement and the related Financing Agreements, other than as described on the attached [list of collateral, which did not include warrants]." (Id., Ex. 30)

On August 9, 2011, the Panel denied Petitioners' application for issuance of the revised subpoena. (Id., Ex. 32)  On October 24, 2011, Petitioners moved for reconsideration of that decision (id., Ex. 33); the motion for reconsideration was denied. (Id., Ex. 35)

Given the Bank's representation that AEI and AEFC had not used warrants as collateral to secure loans from the Bank, it would have been reasonable for the Panel to conclude that issuance of the revised subpoena would serve little purpose.  The Panel might also have concluded that the revised subpoena was still overly broad, given that Petitioners had not (1) reduced the applicable time period but had instead expanded it; and (2) limited the revised subpoena to "information as to whether warrants were used as collateral for interest free loans to any respondent," as the Panel had directed.  In any event, Petitioners have not met their burden

of demonstrating that the Panel's refusal to issue the revised subpoena was an "egregious error"
that constitutes a "denial of fundamental fairness." GFI Sec. LLC, 2002 WL 460059, at *6-7.

### D.   Petitioners Have Not Established that the Panel was Biased

Petitioners argue that the Panel's refusal to hear the evidence discussed above
demonstrates bias. (See Pet. Br. (Dkt. No. 1) at 5)

"An arbitration award may be vacated when the arbitrator is guilty of 'evident
partiality.'" Areca, Inc., 960 F. Supp. at 56 (quoting 9 U.S.C. § 10(a)(2)). "'[E]vident partiality'
involves more than just the 'appearance of bias.'" Local 814, Int'l Bhd. of Teamsters,
Chauffeurs, Warehousemen & Helpers of Am. v. J & B Sys. Installers & Moving, Inc., 878 F.2d
38, 40 (2d Cir. 1989). "'[E]vident partiality' exists 'where a reasonable person would have to
conclude that an arbitrator was partial to one party to the arbitration.'" Id. (quoting Morelite
Constr. Corp. (Div. of Morelite Elec. Serv., Inc.) v. N.Y.C. Dist. Council Carpenters Benefit
Funds, 748 F.2d 79, 84 (2d Cir. 1984)). "In reviewing claims of arbitral bias, courts consider
various factors, including 'the arbitrator's financial interest in the outcome, the nature of the
relationship between the arbitrator and the allegedly favored party and whether the relationship
existed during the arbitration.'" Areca, Inc., 960 F. Supp. at 56 (quoting Pompano-Windy City
Partners, Ltd., 794 F. Supp. at 1278). "However, 'federal courts have concluded that evident
partiality may not be shown by alleged procedural or evidentiary errors, by legitimate efforts to
move the case along, or by failure to follow the rules of evidence.'" Id. (quoting Sisti v. Merrill,
Lynch, Pierce, Fenner & Smith, No. Civ. A. 91 00102-R, 1991 WL 575874, at *3 (E.D. Va.
April 22, 1991)).

Here, the Panel's decisions regarding the disputed evidence, as previously
discussed, were reasonable and do not suggest bias. Petitioners have likewise not shown any

relationship between the arbitrators and Respondents, or any interest of the arbitrators, that suggests bias. Petitioners' disagreement with the arbitrators as to evidentiary determinations does not demonstrate that the Panel was biased.

## III.  THE PANEL'S DETERMINATIONS DO NOT EVINCE A "MANIFEST DISREGARD OF THE LAW"

Petitioners argue that vacatur of the arbitration award is necessary because the Panel "manifestly disregarded the law" by (1) ignoring established legal principles in interpreting the term "gross commissions," as used in Petitioners' employment agreements; (2) not requiring AEI to produce the 200,000 pages of internal AEI e-mails that were produced in the Galinsky arbitration; and (3) rejecting Petitioners' argument that evidence from other arbitrations should be admitted.  (Pet. Br. (Dkt. No. 1) at 36-48)

### A.  Standard for Vacatur Based on "Manifest Disregard of the Law"

Under "the doctrine of manifest disregard of the law, . . . an arbitral panel's legal conclusions will be confirmed in all but those instances where there is no colorable justification for a conclusion." [4]  Wallace v. Buttar, 378 F.3d 182, 193 (2d Cir. 2004).  "A litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a 'heavy burden,' as awards are vacated on grounds of manifest disregard only in 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrator[ ] is apparent.'" [5]  T.Co

---

[4]  To the extent that Petitioners argue that the Panel's decision was issued in manifest disregard of the evidence, that argument is rejected.  "'[T]he Second Circuit does not recognize manifest disregard of the evidence as [a] proper ground for vacating an arbitrator's award.'"  Wallace, 378 F.3d at 193 (quoting Success Sys., Inc. v. Maddy Petroleum Equip., Inc., 316 F. Supp. 2d 93, 94 (D. Conn. 2004)).

[5]  It is an open question whether the "manifest disregard" doctrine constitutes "an independent ground for review or . . . a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10."  Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672 n.3 (2010) ("We do not decide whether '"manifest disregard"' survives our decision in Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 585 [(2008)] as an independent ground for

Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010) (quoting Stolt-Nielsen, 548 F.3d at 91-92 (internal quotations omitted)) (alterations in original).  "[I]t is a doctrine of last resort."  Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 389 (2d Cir. 2003).  "To vacate an award on the basis of a manifest disregard of the law, the court must find 'something beyond and different from mere error in the law or failure on the part of the arbitrators to understand or apply the law.'"  Jock, 646 F.3d at 121 n.1 (2d Cir. 2011) (quoting Westerbeke Corp., 304 F.3d at 208 (internal quotations omitted)).

　　　　"The two part showing requires the court to consider, first, 'whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable,' and, second, whether the arbitrator knew about 'the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it.'"  Id. (quoting Westerbeke Corp., 304 F.3d at 209 (internal quotations and alterations omitted)).  "In determining an arbitrator's awareness of the law, [courts] impute only knowledge of governing law identified by the parties to the arbitration."  Duferco Int'l Steel Trading, 333 F.3d at 390.

**B.    The Panel's Interpretation of "Gross Commissions"**

　　　　Petitioners argue that the Panel manifestly disregarded the law in (1) not applying the doctrine of contra proferentem to resolve ambiguities regarding the meaning of "gross commissions," as used in Petitioners' employment agreements; and (2) not interpreting this term "as a matter of law."  (Pet. Br. (Dkt. No. 1) at 37-45)

　　　　As to the first argument, Petitioners concede that the "contractual language at issue [in their employment agreements is] ambiguous[ ] at best," but they argue that the Panel

---

review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10.").
This Court need not decide this issue because, as explained below, "[e]ven if [the Court]
assume[s] the survival of the standard, [Petitioners] ha[ve] failed to meet it by a long shot."
STMicroelectronics, N.V., 648 F.3d at 78.

did not apply the principle that ambiguous language must be interpreted against the drafter, "which was in this case indisputably the Respondents." (Id. at 37-39; Roth Aff. (Dkt. No. 1), Ex. 12 at 28-29)

   "It is well settled that if two parties give different meanings to words of a purported agreement, the party who sues for enforcement in accordance with his own meaning has the burden to demonstrate that the other party knew what the claimant's meaning was." Canada Life Assurance Co. v. Guardian Life Ins. Co. of Am., 242 F. Supp. 2d 344, 358 (S.D.N.Y. 2003). "Where the language of a contract is held ambiguous, the factfinder . . . may properly consider 'extrinsic evidence as to the parties' intent.'" Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A., 957 F. Supp. 2d 316, 331 (S.D.N.Y. 2013) (quoting JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009)). "[I]f unable to determine the parties' intent based either on the text of an agreement or after evaluating admissible extrinsic evidence, the Court may, in some circumstances, apply the doctrine of contra proferentem to construe any ambiguity against the drafter of the contract." Id. at 332; see also Canada Life Assur. Co., 242 F. Supp. 2d at 358 (quoting Morgan Stanley Grp., Inc. v. New England Ins. Co., 36 F. Supp. 2d 605, 609 (S.D.N.Y. 1999), aff'd in part, vacated and remanded in part on other grounds, 225 F.3d 270 (2d Cir. 2000)) ("'Where extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the contra proferentem rule of contract construction and construe any ambiguities in the contract against the [drafter] as a matter of law.'"). Application of this doctrine is, however, "a matter of last resort." Chesapeake Energy Corp., 957 F. Supp. 2d at 332.

   Here, numerous witnesses testified about the meaning of the term "gross commissions," and whether that term is synonymous with "placement fees," another term used in

Petitioners' employment agreements.  The Panel heard testimony on this issue from all of the claimants (see, e.g., Elisofon Decl. (Dkt. No. 9), Ex. 1 at 211-12, 1143, 1807-08, 2067-68, 2643-45, 3042); from the individual Respondents (id. at 3663-65, 4524, 4556-58); from others who were employed at AEI's New York office (id. at 4806, 5517-23, 5649-53, 5851-55, 5991-96, 6002-03, 6718-26); from AEI's General Counsel, who drafted the employment agreements and exchanged revised drafts with Petitioner Rubenstein (id. at 6446-51, 6484-91); from AEI upper management employees who supervised the operations of AEI's New York office (id. at 6878-85, 6993); and from an expert witness hired by Respondents, who testified about how the term "gross commissions" is used in the securities industry.  (Id. at 7063-69)

Contrary to Petitioners' arguments before the Panel, much of this testimony indicates that Petitioners would have understood – when they entered into their employment agreements – that "gross commissions" were distinct from "placement fees."  Respondents' expert, for example, testified that it is well-understood in the securities industry that "gross commission is what a firm reallocates to the brokers of the gross fee that they have negotiated with whatever entity it happens to be.  It's never, ever the total fee."  (Id. at 7066)  Former employees in AEI's New York office testified that they had the same understanding of the term "gross commissions" during their tenure at AEI.  (See, e.g., id. at 5519 ("Q. And are gross commissions something different than [placement fees]?  A. Yes . . . [P]lacement fees are the fees that the firm is charging outside of gross commission fees . . ."); 5651-52 ("Q. Are gross commissions . . . something different than a placement fee?  A. They are. . . . Q. The placement fee is a higher fee than gross commissions?  A. Correct."); 5855 ("Q. Are gross commissions, which you referred to as being assigned to the grid, is that different than a placement fee?  A. It has nothing to do with the placement fee.  The gross commission is [w]hat the firm elects is on

23

your contract of what you're being paid on any deal they bring in."); 5995-96 ("Q. Are gross commissions that we just talked about different than the placement fee?  A. Yes.  Q. Are gross commissions that you receive something more or less than the placement fee?  A. The gross commissions, for what I knew and what I think everybody else knew that had the same contract as I, it was eight percent gross.  It was different, the placement fee was whatever was on top of that, for the firm."); 6721 ("Q. Is gross commission the same as a placement agent fee?  A. No. They're completely separate."))

Based on such evidence, a reasonable arbitrator could conclude that Petitioners understood – when they entered into their employment agreements – that "gross commissions" had the meaning attributed to it by Respondents.  If the Panel found that this extrinsic evidence demonstrated the parties' intent, no reference to the doctrine of contra proferentem would have been appropriate.  See Chesapeake Energy Corp., 957 F. Supp. 2d at 332.  Given the evidentiary record before the Panel, it cannot be said that its decision to resolve the ambiguity in Respondents' favor amounts to an "egregious impropriety."  See T.Co Metals, LLC, 592 F.3d at 339.

Petitioners also argue that the Panel manifestly disregarded the law because, "[a]s a matter of law, 'commission' and 'placement fee' are indeed synonymous."  (Pet. Br. (Dkt. No. 1) at 42)  This argument is not persuasive.

As noted above, Petitioners conceded at the arbitration that "the contractual language at issue [is] ambiguous."  (Id. at 37)  "[T]he meaning of an ambiguous contract is a question of fact for a factfinder."  Scholastic, Inc. v. Harris, 259 F.3d 73, 82 (2d Cir. 2001).  "If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist."  Alexander & Alexander Srvs., Inc. v. These

24

Certain Underwriters at Lloyd's, London, Eng., 136 F.3d 82, 86 (2d Cir. 1998).  The meaning of "gross commissions" and "placement fees" therefore presented a factual question for the Panel to resolve.  Having conceded that these terms are ambiguous, Petitioners cannot now argue that their meaning can be, and should have been, determined "as a matter of law."

The case Petitioners rely on for the meaning of "placement fees" and "commissions" (not "gross commissions") merely reinforces this point.  (See Pet. Br. (Dkt. No. 1) at 42 (citing Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F. Supp. 216, 226 n.24 (S.D.N.Y. 1993)))  In the Borden, Inc. case, the court concluded that the meaning of these terms presented a question of fact.  See Borden, Inc., 828 F. Supp. at 226 n.24 ("We feel that the plain meaning of the term 'placement fee' is sufficiently similar to the term 'commissions' that a reasonable fact finder may determine that the two are synonymous despite defendants['] statements to the contrary.").

Because the meaning of "gross commissions" – as used in Petitioners' employment agreements – cannot be determined as a matter of law, and because the Panel was presented with substantial evidence supporting Respondents' interpretation, the Panel did not manifestly disregard the law in adopting Respondents' definition of that term.

**C.    Refusal to Require Respondents to Produce Internal E-mail**

Petitioners also allege that the Panel manifestly disregarded the law in not ordering Respondents to produce over 200,000 pages of e-mails that were produced in the Galinsky arbitration.  (Pet. Br. (Dkt. No. 1) at 46-47; Elisofon Decl. (Dkt. No. 1), Ex. 16 at 1)

Evidentiary hearings in the arbitration proceedings before the Panel began on September 12, 2011.  (Roth Aff. (Dkt. No. 1), Ex. 2 at 7)  Petitioners first requested production

of the Galinsky database on November 9, 2011, after discovery had closed.  (Elisofon Decl. (Dkt.

No. 9), Exs. 16-19)

On December 12, 2011, Respondents produced for the Panel's in camera review

e-mails that had been admitted into evidence in the Galinsky arbitration.  (Id., Exs. 16 at 1, 17 at

2)  Respondents represented to the Panel that "discovery ordered in the Galinsky arbitration

proceeded on the basis of extremely broad search terms, using general terms like 'commission'

or 'fee,' and the resulting universe of documents – the Galinsky Database – consist[ed] of

roughly 200,000 pages of documents."  (Id., Ex. 17 at 2)

On January 3, 2012, Petitioners moved to compel production of the entire

Galinsky database.  (Id., Ex. 16)  In response, Respondents offered to produce the entire

Galinsky database to the Panel for in camera review.  (Id., Ex. 17 at 2)  Respondents objected to

producing the entire database directly to Petitioners, arguing that the database had been produced

in the Galinsky arbitration under strict conditions of confidentiality, and that the database

contained privileged communications and likely contained "confidential and proprietary business

communications that [were] not relevant."  (Id., Ex. 17 at 2-3)  Respondents also argued that

review of more than 200,000 pages of documents at that point in the arbitration was "entirely too

costly and burdensome, and indeed also completely unreasonable given the time frame and over-

breadth of emails contained within the Galinsky Database."  (Id., Ex. 17 at 3)

On March 14, 2012, the Panel ruled on Petitioners' motion to compel:

> The claimant's attorneys in another FINRA arbitration involving Respondents
> (referred to as the Galinsky Arbitration) retrieved a 200,000 page database
> (Galinsky database) from Respondents' computer archives.  Of those 200,000
> pages, 116 pages have been admitted into evidence in the Galinsky arbitration.
> Respondents have submitted those 116 pages for "in camera" inspection by the
> Panel.  The Panel has reviewed the 116 pages and has identified 32 pages to be
> reasonably calculated to lead to discoverable evidence relating to this case.  Those

32 pages were produced to Claimants on March 5, 2012.  The Panel is denying
Claimants' request for production of the entire 200,000 page Galinsky database.

(Id., Ex. 20)

"[A FINRA] arbitration panel ha[s] 'great latitude to determine the procedures
governing their proceedings and to restrict or control evidentiary proceedings.'" Finkelstein v.
UBS Global Asset Mgmt. (US) Inc., No. 11 CV 00356 (GBD), 2011 WL 3586437, at *9
(S.D.N.Y. Aug. 9, 2011) (quoting Supreme Oil Co., Inc. v. Abondolo, 568 F. Supp. 2d 401, 408
(S.D.N.Y. 2008)).  In particular, "the arbitration panel[ ] [has] broad discretion to determine
that . . . requested materials would [be] irrelevant and/or unduly burdensome for Respondents to
produce." Id.

Here, production of the Galinsky database was sought after the close of discovery,
and the substantial size of the production is undisputed.  Under these circumstances, arbitrators
have substantial discretion to set appropriate limits on discovery:

> [t]he time frames that arbitrators allow under approved schedules for discovery
> and pre-hearing submissions, deadlines binding on all parties, ordinarily are
> sufficient to provide them with adequate opportunity to present evidence and
> arguments.  There is no categorical rule . . . requiring arbitrators to consider
> evidence even if it is proffered after a specified cutoff established under the rules
> applicable to the arbitration, and against a factual finding[ ] by the arbitrators to
> this effect.  Even judicial proceedings, which are governed by far more rigorous
> procedural standards, do not compel such a result. . . .  Accordingly, if the
> arbitrators make a factual and procedural determination that under their governing
> rules proffered evidence is untimely or not included in approved discovery
> schedules, absent evidence of misconduct that determination is beyond judicial
> review.

Commercial Risk Reins. Co. Ltd. v. Sec. Ins. Co. of Hartford, 526 F. Supp. 2d 424, 430
(S.D.N.Y. 2007).

It was well within the Panel's discretion to conclude that ordering production of
the entire database – and potentially conducting an in camera review of the entire database, in

light of privilege and confidentiality concerns – would unduly delay the proceedings, which had already been ongoing for six months.  It was likewise not unreasonable for the Panel to look to the documents that had been admitted during the Galinsky arbitration in determining which documents were most likely to be probative in this litigation.  To the extent that the Galinsky arbitration was still ongoing, the Panel's order did not preclude Petitioners from seeking review of other documents from the database if they were subsequently admitted during the Galinsky arbitration.

Petitioners have not demonstrated that the Panel acted with "manifest disregard for the law" in refusing to order Respondents to produce 200,000 pages of emails in the middle of the arbitration hearings.

### D.    Precluding Petitioners' Argument Regarding Crowe's Testimony

Petitioners argue that the Panel manifestly disregarded the law by "refus[ing] to permit Petitioners' counsel to cite case law on the record [in attempting to introduce the prior arbitration awards to impeach Respondent Crowe] . . . to create a record for appellate purposes." (Pet. Br. (Dkt. No. 1) at 47-48)

As discussed above, the Panel precluded Petitioners from introducing evidence of other arbitration proceedings against AEI during Crowe's cross-examination.  Petitioners complain that – after the Panel had ruled on this issue and precluded this evidence – it later declined to hear further argument on the issue.  Petitioners point to the following exchange as evidence of the Panel's "egregious misconduct":

> MR. ALONSO: . . . The most important thing I have to address in housekeeping is that I want to apologize for raising my voice and for – it was with respect to the relevance issue and the fact that there is an order barring me from asking anything outside what specifically transpired.  And I want to apologize, because it's not my practice, except where [Respondents' counsel] and I trade barbs, but certainly not to get angry at the panel.

I apologize. I didn't mean to raise my voice in anger. Were it not an issue that is of such importance, I wouldn't have, but the evidence that you're barring is significant. It is routinely allowed in any number of cases, both to explain ambiguities for intent, to show absence of mistake, to explain a term that is ambiguous, to show plan or pattern or course of misconduct.

In coming here, I recognize the Panel ha[s] more liberal rules of evidence, and when that order came down barring that which is routinely accepted in court, because of lack of discovery and the fact that you're a sophisticated business panel, more than is routinely accepted in arbitration, I got upset, and I shouldn't have.

. . .

I am requesting your indulgence. We've been here a long time and will be here some more time. I understand that you don't see the relevance, and I know you think I'm trying to bring past acts in, prior acts in, for the relevance of the precedent value, for instance, arbitration payments. And I assure you, that is not why I am bringing it in.

I will request that you give me ten minutes this morning to explain to you why that's relevant, and I submit to you that it is of importance.

I don't want to beat a dead horse, but I need to explain this to you, because the barring of evidence is so serious, is so prejudicial to my clients, and it's so contra to the weight of law that's used in court, much less arbitration, that I think ten minutes is a small investment to preserve the integrity of these proceedings.

Let me [now] explain to you why I should be allowed to go into something extrinsic to what actually was said between my claimants and those respondents.

. . .

So my point was, if I can have ten minutes, I'm going to request to reconsider that bar of evidence.

. . .

And if I can't have ten minutes, then I'll just drop the issue and just have a standing objection to this ruling, but I think it is important enough to be given ten minutes.

ARBITRATOR MELBARDIS: Certainly we accept your apology. Rest assured that no one on this Panel will hold anything against your clients.

But on the ten-minute issue, the Panel will advise you after a break, because we'll discuss it amongst ourselves.

. . .

[Whereupon, the lunch recess was taken.]

ARBITRATOR MELBARDIS: . . . At this point, on behalf of the panel, I will state that based on what Mr. Alonso has said this morning, we have reconsidered our ruling, and we are not changing our ruling and there is no need for further argument of that issue.

MR. ALONSO: I will abide by your directive, and so that means not even to explain why, like give you some citations of law? You still don't want to hear anything about it, not even ten minutes?

ARBITRATOR MELBARDIS: We're also considering bolstering and redundancy.

MR. ALONSO: But if it's been barred, I'm saying that stuff, I can't ask about – as I said, all I was asking was for ten minutes to explain to you the legal underpinnings.

So we're clear, you don't even want to hear the reasons, and I'm barred as to extrinsic evidence?

ARBITRATOR MELBARDIS: That is correct.

(Roth Aff. (Dkt. No. 1), Ex. 35 at 3969-4140)

Contrary to Petitioners' assertion in this exchange, the record demonstrates that Petitioners had, in fact, previously been permitted to argue the issue of the admissibility of other arbitration awards. (See, e.g., Elisofon Decl. (Dkt. No. 1), Ex. 1 at 3882-91) Petitioners' counsel acknowledged as much, when he said he did not want to "beat a dead horse." (Roth Aff. (Dkt. No. 1), Ex. 35 at 3973) Notably, when Petitioners first sought to introduce this evidence during Crowe's cross-examination, the Panel asked Petitioners' counsel to identify "under what rule [Petitioners were] entitled to bring [the evidence] in." (Id., Ex. 1 at 3886) That question went unanswered.

In any event, Petitioners' rights on appeal were not prejudiced by the Panel's refusal to hear additional argument on this point. To preserve an issue in an arbitration proceeding, all that is required is "that the objection be made before the arbitration is concluded and confirmation of the award sought in court." Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Int'l, Ltd., 683 F. Supp. 945, 955 (S.D.N.Y. 1988), aff'd, 888 F.2d 260 (2d Cir. 1989). Petitioners' counsel repeatedly raised his objection before the Panel; indeed, he noted that he was making a "standing objection" to the ruling. (Roth Aff. (Dkt. No. 1), Ex. 35 at 3974)  The Panel's refusal to hear additional argument on this point does not constitute "manifest disregard of the law."

*      *      *      *

Petitioners have offered no valid ground for vacatur. Accordingly, Petitioners' motion to vacate the arbitration award will be denied.

## IV.   CONFIRMATION OF THE AWARD

Respondents have cross-moved to confirm the Panel's award. "[C]onfirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth, Inc., 750 F.2d at 176. "The arbitrator[s'] rationale for an award need not be explained, and the award should be confirmed '"if a ground for the arbitrator's decision can be inferred from the facts of the case."'" D.H. Blair & Co., Inc., 462 F.3d at 110 (quoting Barbier, 948 F.2d at 121 (quoting Sobel, 469 F.2d at 1216)). "This is so even if the ground for their decision is based on an error of fact or an error of law." Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 13 (2d Cir. 1997). "Only 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." D.H. Blair & Co., Inc., 462 F.3d at 110 (quoting Landy Michaels Realty

31

Corp., 954 F.2d at 797).  "Any ambiguity in the award must be resolved, if possible, in a manner supporting the award's confirmation."  GFI Sec. LLC, 2002 WL 460059, at *5.

Here, there is no evidence that the Panel's decision was made arbitrarily, that the arbitrators exceeded their authority, or that their decision was otherwise contrary to law.  To the contrary, the Panel heard substantial evidence supporting AEI's interpretation of the term "gross commissions."  Accordingly, this Court cannot find that there was no colorable justification for the Panel's determination on this issue.

Similarly, as to compensation from warrants, Petitioners ultimately conceded that warrants relating to only one company – Spectra Science – were actually at issue (see Elisofon Decl. (Dkt. No. 1), Ex. 1 at 5481-83), and that those warrants ultimately "were not worth anything."  (Id., Ex. 1 at 5270-71)  The Panel had a reasonable basis to conclude that Petitioners were not owed any warrant compensation.

The Panel's award of compensatory damages and attorneys' fees to AEI – based on the unpaid balances due on the promissory notes – is likewise supported by the record.  The plain language of Petitioners' employment agreements and the promissory notes themselves make clear that (1) Segal is liable for any outstanding amounts (including interest) at the end of his employment with AEI, regardless of the reason for his departure (Id., Ex. 38); (2) Rubenstein, Cardone, and Landskowsky are liable for any outstanding amounts (including interest) if they voluntarily terminate their employment (Roth Aff. (Dkt. No. 1), Exs. 5, 6, 9); and (3) Petitioners are liable for attorneys' fees and costs incurred by AEI in enforcing the notes and collecting unpaid amounts (Elisofon Decl. (Dkt. No. 9), Exs. 38-40).

Respondents' motion to confirm the award will be granted.

V.     **RESPONDENTS' REQUEST FOR POST-AWARD**
       **INTEREST, ATTORNEYS' FEES, AND COSTS**

Respondents seek an award for (1) interest from the date of the Panel's award, and (2) attorneys' fees and costs in connection with proceedings before this Court. (Resp. Br. (Dkt. No. 10) at 34-36)  Respondents' request is based on language in the promissory notes and an argument that Petitioners should be "sanction[ed] for [pursuing] unnecessary proceedings under 28 U.S.C. § 1927." (Id.)  Petitioners do not address these issues in their opposition to Respondents' cross-motion to confirm the arbitration award. (See Pet. Reply Br. (Dkt. No. 15))

A.     **Post-Award Interest**

"The award of post-judgment interest is in the discretion of the trial judge and there is a presumption in favor of awarding such interest." GFI Sec. LLC, 2002 WL 460059, at *8 (citing Waterside Ocean Navigation Co., Inc. v. Int'l Navigation Ltd., 737 F.2d 150, 153-54 (2d Cir. 1984); In Matter of Arbitration between Soft Drink & Brewery Workers Union Local 812, IBT, AFL-CIO, No. 95 Civ. 8081 (SAS), 1996 WL 420209, at *3 (S.D.N.Y. July 25, 1996)). "Interest on an arbitration award is payable from the date of the award rather than from the date the award is confirmed." Id.

"In diversity actions interest [on an arbitration award] is to be calculated according to the state statutory rate." Irving R. Boody & Co., Inc. v. Win Holdings Int'l, Inc., 213 F. Supp. 2d 378, 383 (S.D.N.Y. 2002). "The rate in New York is 9% per annum." Id. (citing N.Y. C.P.L.R. § 5004).

FINRA Rules – which all parties agreed to abide by in submitting their dispute to arbitration – similarly provide that "[a]n award shall bear interest from the date of the award . . . [i]f the award is the subject of a motion to vacate which is denied. . . . Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award was rendered. . . ."

FINRA Rule 13904(j).  The notice accompanying the Panel's disposition in this case expressly references this rule.  (Elisofon Decl. (Dkt. No. 9), Ex. 37)

Accordingly, it is appropriate to grant post-award interest running from the date of the arbitration award – December 6, 2012 – to the date Respondents receive payment. Because this is a diversity action (see Notice of Removal (Dkt. No. 1) ¶¶ 6-8) and the arbitration took place in New York (see Roth Aff. (Dkt. No. 1), Ex. 2), the New York statutory rate of 9% will apply.

      **B.**    **Attorneys' Fees and Costs**

The promissory notes provide that Petitioners will be liable for "any and all of the holder's costs in connection with the enforcement and collection [of unpaid amounts], including without limitation any and all attorneys' fees."  (Elisofon Decl. (Dkt. No. 9), Exs. 38-40)

"The general rule in the United States is that each party must pay its own legal fees." Cob Shipping Canada Inc. v. Trans Mktg. Houston, Inc., No. 93 Civ. 0033 (PKL), 1993 WL 300043, at *6 (S.D.N.Y. Aug. 4, 1993).  "However, it is well settled that '[a]n exception to this rule is the existence of an agreement between the parties that legal fees are recoverable.'" Id. (quoting Trans-Asiatic Oil, Ltd. S.A. v. UCO Marine Int'l, Ltd., 618 F. Supp. 132, 137 (S.D.N.Y. 1985)) (alteration in original).

Here, the Panel properly awarded Respondents attorneys' fees against each Petitioner "pursuant to the terms of the promissory note[s]."  (Roth Aff. (Dkt. No. 1), Ex. 2 ¶¶ 4, 6, 8, 10)  Given the unambiguous language quoted above, Respondents are entitled to recover the attorneys' fees and costs they incurred "in connection with the enforcement and collection" of the notes.  See Elite Inc. v. Texaco Panama Inc., 777 F. Supp. 289, 292 (S.D.N.Y. 1991) (awarding attorneys' fees and costs incurred in moving to confirm an arbitration award, and in

opposing a motion to vacate the award, where parties' contract provided that "'[d]amages for breach of this Charter shall include all provable damages, and all costs of arbitration suit and attorneys' fees incurred in any action hereunder'").

Accordingly, Respondents are entitled to an award reflecting reasonable attorneys' fees and costs incurred in connection with the instant motions. The appropriate amount of that award will be determined after additional briefing by the parties.

## CONCLUSION

For the reasons stated above, Petitioners' motion to vacate the arbitration award is denied, and Respondents' cross-motion to confirm the award is granted, with post-award interest, attorneys' fees, and costs.

The following briefing schedule will apply to Respondents' application for attorneys' fees and costs:

1. Respondents' papers are due on **April 11, 2014**;

2. Petitioners' opposition is due on **April 21, 2014**; and

3. Respondents' reply, if any, is due on **April 28, 2014**.

The Clerk of the Court is directed to terminate the motion (Dkt. No. 8).

Dated: New York, New York
       March 31, 2014

                              SO ORDERED.

                              _____
                              Paul G. Gardephe
                              United States District Judge